

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00337-CV

———————————————

IN THE INTEREST OF M.M., A CHILD

On Appeal from the 90th District Court
Young County, Texas
Trial Court No. 33031

Before Sudderth, C.J.; Gabriel and Kerr, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

After a bench trial, the trial court terminated Father's and Mother's parental rights to their daughter, M.M.[1] Both appealed, and in a joint brief, they argue three points: in the first two, they assert that the evidence is legally and factually insufficient, respectively, to prove grounds, and in the third, they maintain that the evidence is factually insufficient to prove that termination was in M.M.'s best interest. We affirm.

## The Trial Court's Findings

The trial court terminated both Father's and Mother's parental rights on the same bases:

- Each failed to comply with the provision of a court order that specifically established the actions necessary to obtain the return of M.M., who had been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of M.M.'s removal from the parents under Chapter 262 for the abuse or neglect of M.M; and

- Terminating the parent-child relationship was in M.M.'s best interest.

*See* Tex. Fam. Code Ann. § 161.001(b)(1)(O), (2). These are the findings that Father and Mother attack.

---

[1]To protect the parties' privacy in this case, we identify the child by her initials and her parents simply as Father and Mother. *See* Tex. Fam. Code Ann. § 109.002(d).

## Standard of Review

### A. Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish, by clear and convincing evidence, two things: (1) the parent's actions satisfy just one of the many grounds listed in family code

§ 161.001(b)(1), and (2) termination is in the child's best interest under § 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; that is, termination may not be based solely on the child's best interest as determined by the factfinder. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

**B. Legal Sufficiency**

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And

4

even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

### C. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### The Grounds Findings

### A. The evidence supporting the § 161.001(b)(1)(O) findings legally suffices.

In their first point, Father and Mother argue that "because the Department did not introduce the order [that they failed to comply with] into evidence or ask either

the associate judge or the trial judge to take judicial notice of the court's file, the order is not in evidence and, consequently, the evidence is legally insufficient to sustain the trial court's judgment of termination." We disagree. The record shows that Associate Judge Alyce Bondurant took judicial notice of the court's file. And the record shows that Judge Stephens Bristow similarly took judicial notice of the court's file at the de novo hearing. (Father and Mother appealed the associate judge's ruling for a de novo hearing.) We hold that the evidence legally suffices and overrule Father and Mother's first point. *See J.F.C.*, 96 S.W.3d at 266.

## B. The evidence supporting the § 161.001(b)(1)(O) findings factually suffices.

Parents must comply with each requirement of a court-ordered service plan; complying merely substantially is not good enough to avoid termination under subsection (O).[2] *In re M.C.*, No. 02-15-00290-CV, 2016 WL 354186, at *4 n.8. (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.); *In re C.S.*, No. 02-14-00386-CV, 2015 WL 1869443, at *10-11 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem. op.). Subsection (O) speaks only of a parent's failure to comply with a court order, without reference to quantity of failure or degree of compliance, and it does not

---

[2]The Department filed this suit in September 2016 before § 161.001(d)'s September 1, 2017 effective date. *See* Tex. Fam. Code Ann. § 161.001(d); *In re A.W.*, No. 02-18-00147-CV, 2018 WL 5074770, at *9–10 (Tex. App.—Fort Worth Oct. 18, 2018, pet. denied) (mem. op.). That subsection now allows a parent to excuse full compliance with a court order by proving an inability to comply with specific provisions and showing a good-faith effort to comply that fell short through no fault of the parent.

provide a means of evaluating partial or substantial compliance with a plan. *In re N.A.*, Nos. 02-13-00345-CV, 02-13-00346-CV, 2014 WL 814195, at *5 (Tex. App.—Fort Worth Feb. 28, 2014, no pet.) (mem. op.); *In re G.C.*, No. 02-17-00259-CV, 2018 WL 547784, at *16 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.).

The trial court adopted Father and Mother's service plan as its own order. Despite Father's and Mother's complying with many portions of the court-ordered service plan, the evidence also showed that they failed to comply with several of its provisions.

For example, the service plan required Father and Mother to provide identifying information for anyone living in their home; Father admitted that his daughter lived with them and that he did not tell the Department. Mother denied that Father's daughter moved in with them but admitted that she "visited for a while." As the factfinder, the trial court was free to reconcile this conflict by believing Father and disbelieving Mother. *See In re A.S.*, Nos. 02-18-00235-CV, 02-18-00236-CV, 2019 WL 237561, at *9 (Tex. App.—Fort Worth Jan. 17, 2019, pet. denied) (mem. op.); *In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.). This violation alone supports the (O) findings for each parent. But the Department cited other instances.

The service plan required both parents to complete a psychological evaluation and to follow its recommendations. And as part of their psychological evaluations, both were recommended to undergo individual counseling. The caseworker testified

7

that neither parent had addressed existing paranoia and trust issues. At least as to Mother, the record showed that she balked at the idea of counseling. As for Father, the caseworker expressed frustration with Father's attitude that he had nothing more to learn.

Next, M.M. had medical appointments and needed medical care; the service plan required Father and Mother to participate in them. But Father and Mother missed four or five cardiology appointments, and they missed both urology appointments. Although both parents could argue partial compliance, subsection (O), as it applied to them, made no allowances for partial compliance. *See N.A.*, 2014 WL 814195, at *5; *G.C.*, 2018 WL 547784, at *16.

Another example the Department gave was that the service plan required Father and Mother to complete an MHMR[3] assessment and follow all its recommendations. The caseworker testified that Father had complied with this requirement but Mother had not. Although the MHMR assessment made no recommendations with regard to Mother, the caseworker explained that that was because Mother had made it clear that she did not want or need any services.

And despite this case's presenting no substance-abuse issues, the caseworker testified that (unlike Father) Mother did not fully comply with her substance-abuse assessment because she did not comply with the MHMR assessment, which was

---

[3]Mental Health Mental Retardation. *See In re S.L.S.*, No. 02-04-00186-CV, 2005 WL 250688, at *3 (Tex. App.—Fort Worth Feb. 3, 2005, no pet.) (mem. op.).

"boot-strapped": that is, the substance-abuse assessment recommended referring Mother to MHMR and following its recommendations, and because Mother did not comply with the MHMR recommendations, she did not comply with the substance-abuse assessment.

In light of the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that both parents violated the subsection (O) ground and that the evidence thus factually suffices. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 25. We overrule Father and Mother's second point.

## The Best-Interest Findings

### A. Best Interest

We acknowledge the strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). To determine the child's best interest, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence used to show a subsection (1) ground may be probative when determining best interest under subsection (2). *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the factfinder may use when determining the child's best interest include

- the child's desires;
- the child's emotional and physical needs now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;

9

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some of them may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one of these factors may suffice in a particular case to support a finding that termination is in the child's best interest. *See id.* On the other hand, in some cases, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Evidence

### 1. Father and Mother meet in 2011 and get married.

In 2011, when Mother was 18 years old and living with her mother and her mother's boyfriend, Mother decided to move to the woods, leaving with nothing other than a pocket knife. She had no job and no money; she did not even have a sleeping bag.

10

Certain evidence explained Mother's impulsive move. She reported that from the age of seven or eight, different men, including her mother's boyfriends and apartment employees, had raped her, and when she went to the police for help, her own mother—who had been prostituting her out—blocked her efforts to stop the abuse.

On Mother's way to the woods that day, she met Father at a gas station. Father was 58 at the time.

Like Mother, Father had had a difficult childhood. He never knew his birth father. He was raised by his stepfather, who beat him until he was 15 years old. These beatings fostered a dislike for the Department because, Father said, it knew about his stepfather's abuse but did nothing to help him.

And like Mother, Father's mother was the source of personal trauma. When Father was in his 40s, his mother committed suicide. Father reported seeing "the aftermath of mom placing a 357 magnum in her mouth and 'blowing her brains out.'"

After Mother met Father at the gas station on her way to live in the woods, their paths merged. She moved in with him, and a month or two later, they were married. Mother was Father's seventh bride.

### 2. Both Father and Mother are on disability.

Mother testified that she had been on social-security disability all her life for mental-health reasons. Father worked as a mechanic until 1990 (he would then have been about 37 years old) when a motor fell on him and injured his back. After that, he

supported himself for over 15 years by playing music in nursing homes and clubs. Only after a second surgery on his neck at age 55 did he start receiving social-security disability. He elaborated, "[S]o far I've had three surgeries on my neck. They've taken out four disks in a row. . . . I have got a metal junkyard holding my head on." Unable to lift over 15 pounds, he said that he could no longer work.

### 3. Mother gives birth to M.M. in 2016, and M.M. has health issues.

Mother gave birth to M.M. in May 2016. M.M. had aortic stenosis, which a nurse described as "a narrowing or closing of part of the aorta, which is the main pathway of the blood through the heart and the body." When the aorta is closed off, the nurse explained, the heart must work harder to supply blood to the body, meaning that the child fatigues more easily. A child with this condition can take only so much nourishment before becoming fatigued from trying to either nurse or drink from a bottle. Because all the child's energy is used just to try to keep blood flowing through its body, the child will not grow as well or gain weight.

In September 2016, when M.M. was about four months old, she had heart surgery to repair her aorta. Consistent with the nurse's description at trial of this condition, the hospital's records showed that M.M. met the standards for moderate malnutrition due to inadequate weight gain caused by insufficient intake of nourishment.

**4. The hospital staff becomes concerned over Mother's inability to properly care for M.M., and the Department investigates the situation.**

While M.M. was at the hospital, the Department became involved when issues arose about Mother's inability to adequately care for M.M. There were several concerns.

For example, although M.M. had feeding issues, Mother appeared indifferent or thoughtless. Mother would not feed M.M. during the nights, and she once reported to the hospital staff that she fed M.M. only every eight to ten hours. And when Mother would feed M.M., she was caught diluting the formula. On other occasions, the staff discovered that when M.M. woke up, Mother would give her a pacifier rather than feed her.

Another concern was that, due to M.M.'s surgery, she had to be picked up in a certain manner; picking her up under the arms rather than scooping her up could cause her sternum to fuse improperly and require additional surgery. Despite instructions, Mother would pick M.M. up improperly.

A third concern—apparently more so after M.M.'s discharge—was that M.M. needed someone to timely administer blood-pressure medicine to her. If the medications were not administered properly, the consequences could be life-threatening.

**5. Father agrees to help, but concerns persist.**

With Mother faltering in her ability to properly care for M.M., Father agreed to remain at the hospital to help.

But like Mother, Father overslept for scheduled feedings, and he then blamed Mother for not waking him up. Despite the presence of both parents, hospital staff reported that Father and Mother were still late on nighttime feedings and that Father had allowed Mother to feed M.M. without supervision. Both Mother and now Father were picking M.M. up improperly.

On one occasion, hospital staff called security when Father threatened Mother. At trial, Father acknowledged that someone had called security on him, but he denied threatening Mother.

**6. M.M.'s imminent discharge prompts the Department to act.**

When M.M. was ready to be discharged from the hospital, the Department filed its petition, and on the same date, the trial court signed an order appointing the Department as M.M.'s temporary managing conservator.

**7. After her discharge, M.M. experiences new health issues.**

While the case was pending, M.M. encountered and battled new health issues.

First, M.M. had to be hospitalized for about nine days for what was variously described as constipation, an enlarged kidney, a urology problem, and a urinary-tract infection. This episode led to Mother's later bringing one of M.M.'s three-week-old soiled diapers to court and attempting to open it during a hearing to show that M.M.

had blood in her stool. The caseworker acknowledged that M.M. had blood in her stool from being constipated and straining but explained that that was what prompted M.M.'s hospitalization.

Next, M.M.'s left eye was described as drifting "off to the far side," making it difficult for her to see. M.M. was wearing prescription glasses at the time of trial to address that issue and would later have to wear a patch for a couple of months; if the problem persisted, the caseworker explained that M.M. would need surgery.

Another problem was M.M.'s walking in a "stiff-legged" manner. Early Childhood Intervention was seeing M.M. once a week for several hours to address her walking issues, and the foster parents did exercises with M.M. to strengthen her leg muscles. The caseworker explained that simply going to ECI once a week was not enough and that M.M.'s caretakers had to work with her during the rest of the week. In addition to the exercises, M.M. wore braces on her legs to help strengthen them; as M.M. grew, the leg braces would have to be refitted. The caseworker did not know how long M.M. would have to wear them.

After addressing M.M.'s walking issues, the Department planned to send her to speech therapy. The caseworker explained that M.M. called everything—the dog, the lamp, people, and snacks—"Mama." Although M.M. was not able to verbalize well, she was learning some basic sign language to communicate.

### 8. Father's and Mother's psychological evaluations raise new concerns.

After testing, Mother was assessed as having a full-scale IQ of 77, and Father's was 85.

Mother had four diagnoses: (1) "major depressive disorder, mild, recurrent"; (2) "posttraumatic stress disorder (by history)"; (3) "personality disorder not otherwise specified, with paranoid features"; and (4) "borderline intellectual functioning." A second psychologist provisionally assessed her this way: (1) "major depressive disorder recurrent mild"; (2) "posttraumatic stress disorder"; (3) "rule out borderline personality disorder"; and (4) "rule out paranoid personality disorder."[4]

Father was diagnosed with "delusional disorder, grandiose & persecutory type." A second psychologist diagnosed him with (1) generalized anxiety disorder and (2) "mixed personality disorder [with] borderline, paranoid, and narcissistic features."

Father admitted making numerous colorful statements, but he took umbrage at being called "delusional."

Father agreed that he told one of his psychologists that he was offered a music contract in Nashville but turned it down and that he was Dwight Yoakam's double in a movie around 1994 or 1995. At trial, Father elaborated that after injuring his back in 1990, he supported himself by playing music. His band's name was Texas Tyme, and

---

[4]A "rule out" diagnosis is a working diagnosis or one that cannot be diagnosed from a single visit. *See In re T.T.F.*, 331 S.W.3d 461, 465 (Tex. App.—Fort Worth 2010, no pet.).

they went to Nashville in 1995, played at the Wildhorse Saloon, and were on TNN TV. Father also described how in 1994 he was paid $75 as a rodeo-crowd extra in Dwight Yoakam's movie *Painted Hero*, which Father said was filmed in Pilot Point, and how he "got to play a couple [of] little parts for Dwight" in a jail scene.

Another example was Father's telling his psychologist that his hands and feet were registered as deadly weapons, that he had taken karate lessons with Chuck Norris, and that he was the only person who had knocked Norris down with one swing. But at trial, Father denied claiming that he was the only person to dispatch Norris so handily.

Next, Father further admitted telling his psychologist that he had a 185 IQ when he was young. When confronted with his present full-scale 85 IQ, Father responded, "I probably am now since I had those two strokes. Strokes take a lot out of you."

And Father told one therapist that when he was 27 years old, he went to bed at 5'2" and woke up 5'7" the next morning. Finally, as he admitted at trial, Father told his therapist that there was a black market for babies and that was why CPS had taken his child.

Father stated, "I still don't understand why anybody would think that [I need mental health treatment]." Elaborating, he said, "I don't hurt anybody[,] I pay bills[,] . . . and I take care of everything I can."

Father also expressed exasperation with his psychologist: "Well, as far as I'm concerned, [my psychologist is] a[n] idiot, telling me that I'm delusional. . . . I've got proof of where I've been and what I have done and what I can do." Father, who had spent his whole life working on cars, also remarked, "Can [my psychologist] rebuild an automatic transmission? I can."

### 9. Father's age and health pose still further concerns.

Father was 65 years old at the time of trial and had numerous health issues. He reported having had five heart attacks and two strokes. He had Type 2 diabetes, diabetic neuropathy, and COPD,[5] and he took medications for high blood pressure. When Father revealed that he still smoked, the Department's attorney followed up:

Q. Why are you still smoking?

A. When I cut down to three cigarettes a day is when I started having the strokes.

Q. So let me get this straight.

A. I don't want to have no more strokes.

Q. You're saying that smoking cigarettes is keeping you from having strokes?

A. Keeps me a lot calmer.

Q. So you're saying smoking cigarettes is keeping you from having strokes?

A. Yes, ma'am.

---

[5]Chronic obstructive pulmonary disease.

Q. You understand that that is totally contraindicated by the medical literature?

A. I can't help that.

Noting Father's age and poor health, the caseworker observed that at some point Mother might have to raise M.M. by herself, something the caseworker doubted Mother was capable of.

**10. Father and Mother resist instructions.**

From the Department's removal affidavit forward, a recurring theme was Father's and Mother's intransigence. The caseworker described both parents as highly resistant to any type of therapy and asserted that both resisted being told how to do things in any way other than the way they already knew.

According to the caseworker, Mother argued about everything and would not follow instructions. Mother's response to counseling was, "I don't need counseling." The caseworker added that "[e]very conversation I've attempted to have with [Mother] throughout the last year and a half, she's argued with me and often goes back on her word on things that she's saying they have done or haven't done." At trial, Mother asserted that she had nothing to gain from any more counseling "[b]ecause counseling [did] more harm than good."

Although the caseworker had more faith in Father's ability to care for M.M., Father's inability to communicate with Mother undermined that same faith. Father had admitted not discussing some matters with Mother because she argued about

everything and would not listen, adding, "[S]he argues with everybody, including herself."

Similar to Mother's uncooperative attitude, Father claimed to have learned very little, if anything, at his parenting classes. The caseworker put it a little more bluntly: Father denied learning anything at parenting because he already knew it all. Father himself also flatly said, "I don't think I need the therapy."

The caseworker explained that Father's and Mother's inability to learn and adapt was what had prompted the initial removal for abuse or neglect—both were underfeeding M.M. despite the hospital staff's monitoring them.

By the time of trial, the opposite problem had presented itself. The caseworker testified that more than once she had seen Father and Mother overfeed M.M. Overfeeding caused M.M.'s stomach to become very taut; M.M. would then feel discomfort and had been known to throw up, after which she would not eat for the rest of the evening. When the caseworker asked Mother not to feed M.M. so much, Mother responded, "I know how to take care of my child." That, the caseworker said, had been Mother's response to almost everything the Department had suggested over the last 18 months.

### 11. Mother's dog acts aggressively towards M.M., but Mother refuses to give it up.

Mother had a 50-pound dog, described by one observer as a pit bull terrier with an electric shock collar around its neck, which Mother asserted was a service dog for

her post-traumatic stress disorder. In Mother's telling, shock collars were not just for aggressive dogs; hers had one to prevent it from running across busy streets. Mother denied that her dog was aggressive and that it wore a shock collar for that reason.

In any event, the dog had acted aggressively, had snapped "[a]t anybody in general, [but] especially at [M.M.]," and had growled at the attorney ad litem, whom the dog openly disliked. A licensed psychological associate who had seen a visit with the dog present recommended that the dog have no unsupervised contact with M.M.

Despite the safety concerns about Mother's dog, she refused to get rid of it, claiming that she needed it for her mental disability. Even if it meant that she could not sleep for the next 16 years, she said that she was not giving up either her dog or her daughter. Mother's refusal to even discuss getting rid of her dog indicated to the caseworker that Mother had some serious judgment issues.

Father also questioned Mother's judgment: "If [the dog] can't live with the baby, I'll get rid of [the dog] before I would the baby. . . . Any parent that wouldn't is not a parent." That Mother did not respond that way concerned Father, too.

**12. Father and Mother use questionable judgment during visitations.**

During one visit, the caseworker said that one of the parents put a rocking horse on top of a sofa and then put M.M. on the rocking horse, which the caseworker did not consider safe child play. Along the same lines, the licensed psychological associate's notes from one visit mentioned Father's letting M.M. twice stand up while

in a rocking chair, which she described as dangerous behavior. And during another visit, Father picked M.M. up and placed her on top of Mother's dog.

### 13. M.M. does not appear bonded to Father and Mother.

During visits, M.M. did not respond positively when seeing her parents, and when the visits ended, she expressed no negative reaction. The licensed psychological associate wrote that when the Department worker entered the room to get M.M. at the end of one visit, M.M. looked at her, smiled, and reached out for the worker; although Mother tried to get M.M. to look at her so that she could say goodbye, M.M. continued to reach for the Department worker. The associate concluded that "[M.M.] did not cry or appear upset when leaving her parents."

### C. Discussion

At the hospital, even while being monitored by staff, both Father and Mother showed that they were not able to care for M.M.; this inability is what precipitated M.M.'s removal. And after the removal, Father's and Mother's conduct reinforced rather than mitigated these concerns. Mother lacked the discipline, the insight, and the adaptability to care for a child, especially one with health issues. And Father had no more success modifying Mother's conduct than did the various counselors and therapists. Although the caseworker expressed confidence in Father's abilities, a reasonable factfinder might have concluded otherwise. Given Father's age and poor health and given that he would have been living with Mother and her dog, a reasonable factfinder could have concluded the prospect of returning M.M. to Father

22

and Mother was untenable. Finally, M.M. did not display any emotional attachment to them. Determining best interest focuses on what is best for the child, not what is best for the parents. *In re R.A.*, No. 02-18-00252-CV, 2019 WL 490121, at *10 (Tex. App.—Fort Worth Feb. 7, 2019, no pet.) (mem. op.). We hold that a factfinder could reasonably form a firm conviction or belief that termination was in M.M.'s best interest and thus that the evidence factually suffices, and we overrule Father and Mother's third point. *See C.H.*, 89 S.W.3d at 25; *Holley*, 544 S.W.2d at 371–72.

## Conclusion

Having overruled Father and Mother's three points, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: April 11, 2019